## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:12-CV-152-F

| | |
|---|---|
| SHEILA KING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) ORDER |
| | ) |
| NORTH CAROLINA DEPARTMENT | ) |
| OF PUBLIC SAFETY, DIVISION OF | ) |
| ADULT CORRECTION, WILLIAM | ) |
| GARDNER, | ) |
| | ) |
| Defendants. | ) |

In this case Plaintiff, a former correctional officer at the North Carolina Correctional Institution for Women, alleges a claim for violations of Title VII of the Civil Rights Act of 1964, based on the allegedly improper sexual advances by Correction Sergeant William Gardner. Defendant North Carolina Department of Public Safety ("NCDPS") has filed a Motion for Summary Judgment [DE-25] and Motion to Strike [DE-32]. For the reasons more fully stated herein, the Motion to Strike [DE-32] is DENIED and the Motion for Summary Judgment [DE-25] is ALLOWED in part and DENIED in part.

## I. PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint in the North Carolina General Court of Justice, Superior Court Division, Wake County, on March 6, 2012, naming NCDPS and William Gardner as defendants. NC DPS filed a Notice of Removal [DE-1] on March 22, 2012. The parties filed a Stipulation of Dismissal [DE-10] as to Plaintiff's claim against Defendant Gardner on May 15, 2012.

After conducting discovery, NC DPS filed its Motion for Summary Judgment. Plaintiff filed her response, and attached thereto her affidavit, a copy of her complaint, and the Notice of Investigative Findings [DE-30-4] issued by the North Carolina Office of Administrative Hearings ("OAH"), finding that there is reasonable cause to believe that Plaintiff was subjected to unlawful discrimination because of her sex. NC DPS did not file a reply in support of its Motion for Summary Judgment.

NC DPS thereafter filed a Motion to Strike Plaintiff's affidavit, complaint, and Notice of Investigative findings. Plaintiff filed her response thereto, but NC DPS has failed to file a reply. Both motions, accordingly, are ripe for disposition.

## II. MOTION TO STRIKE

NC DPS moves to strike Plaintiff's affidavit, her attached complaint, and the OAH's Notice of Investigative Findings, arguing that the documents are not based on personal knowledge, rely upon speculation or hearsay, or are documents that cannot be considered in conjunction with a motion for summary judgment. These documents constitute the bulk of what Plaintiff has submitted in opposition to the Motion for Summary Judgment. Accordingly, to determine what information may be considered in resolving the Motion for Summary Judgment, the court must first address the Motion to Strike.

NC DPS correctly observes that Federal Rule of Civil Procedure 56(c)(4) requires that affidavits or declarations submitted in connection with motions for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." NC DPS incorrectly asserts, however, that any affidavit or portion of an affidavit not complying with the aforementioned rule

2

must be "stricken." The only procedural rule that allows for "striking" of materials is Federal Civil

Rule of Procedure 12(f), and it provides that only pleadings may be stricken. *See* Fed. R. Civ. P.

12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial,

impertinent or scandalous matter."); *see also Int'l Longshoremena's Assn. Steamships Clerks Local

1624, AFL-CIO v. Virginia Int'l Terminals, Inc.*, 904 F. Supp. 500, 504 (E.D. Va. 1994) (concluding

that summary judgment briefs and affidavits are not pleadings and therefore a Rule 12(f) motion

could not be used to "strike" such documents). Here, almost all of the documents, or portions

thereof, that NC DPS seeks to strike are not pleadings. Moreover, although Plaintiff has attached

a copy of the Complaint as an exhibit to her Affidavit, the record is abundantly clear that Plaintiff

is not using the "Complaint" as a pleading. Accordingly, to the extent that NC DPS seeks to "strike"

certain documents from the record, its motion is DENIED.

"The proper way for a party to register its objection to an opposing party's motions,

memoranda, or affidavits is through the briefs or memoranda the party submits to the court." *Muir

v. Applied Integrated Techs., Inc.*, Civil Action No. DKC 13-0808, 2013 WL 6200178, at \*4 (D. Md.

Nov. 26, 2013) (citing *McNair v. Monstanto Co.*, 279 F. Supp. 2d 1290, 1298 (M.D. Ga. 2003)). In

other words, in a response or a reply brief, a party may argue that certain affidavits or other evidence

should not be considered by the court. "'The court will then implicitly, if not explicitly, rule upon

[the] objections in its consideration of the motion.'" *Id.* (quoting *McNair*, 279 F.Supp. 2d at 1298).

Here, the court will now consider each of NC DPS's objections.

## A. Plaintiff's Affidavit and Attached Complaint

To her response in opposition to NC DPS's motion for summary judgment, Plaintiff has

attached her Affidavit [DE-30-1], which incorporates "[t]he factual allegations made in [her]

3

previously filed complaint ... as if fully set forth" therein, and also attaches a copy of the Complaint [DE-30-2]. NC DPS argues that the court cannot consider either of those documents.

With regard to the Complaint, NC DPS argues, correctly, that Plaintiff cannot rely on mere unsworn pleadings to oppose a motion for summary judgment. *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) ("A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'") (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). Plaintiff, however, is not offering the stand-alone Complaint as evidence. Rather, she has expressly incorporated the allegations of the Complaint into her affidavit. Pl.'s Aff. [DE-30-1] ¶ 4. She is therefore not resting upon "mere pleadings" but is attempting to rely on something similar to a verified complaint. *See Madey v. Duke Univ.*, 336 F. Supp. 2d 583, 606 (M.D.N.C. 2003) ("[W]hen a Plaintiff files a *verified* complaint, the complaint functions as an opposing affidavit for summary judgment purposes, so long as the allegations contained in the complaint are based upon personal knowledge.").

As NC DPS observes, there nevertheless still is a problem with Plaintiff's Affidavit. Federal Rule of Civil Procedure 56(c) provides that an affidavit filed in connection with a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Plaintiff's Affidavit, however, states that it "is made upon my personal knowledge except those allegations made on information and belief, and these I believe to be true." Aff. [DE-30-1] ¶ 3. The Affidavit ends with a similar verification. *Id.* p. 3 ("My name is Sheila King. I swear the allegations in this document and those incorporated by reference are true to the best

4

of my knowledge and belief, except those allegations made on information and belief, and those I believe to be true."). The Fourth Circuit has considered a substantially similar verification, and concluded that it was insufficient to transform a complaint into an affidavit because the complaint did not indicate which factual allegations were based on the plaintiff's personal knowledge, as opposed to information and belief. *See Walker v. Tyler Cnty. Commission*, 11 F. App'x 270, 274 (4th Cir. 2001) (per curiam) (rejecting the following verification: "[T]he facts contained within the attached pleading [are] true, except insofar as they are therein stated to be upon information and belief, and insofar as they are therein stated to be upon information and belief, [Plaintiff] believes them to be true"); *see also Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) (determining that a verification based upon the plaintiff's "own personal knowledge or upon his information and belief" was "insufficient for the purposes of opposing a motion for summary judgment"). NC DPS contends that this court, therefore, must exclude the entirety of Plaintiff's Affidavit (including presumably, the entirety of the allegations incorporated from the Complaint).

Rather than exclude the entirety of the Affidavit, the court finds it more prudent to undergo an independent analysis of whether a particular factual statement is admissible when it is relied upon by Plaintiff in opposing summary judgment. *See Hogges v. Stephens,* 3:09CV582, 2011 WL 2161100 at *3 (E.D. Va. June 1, 2011) ("[T]o the extent that Plaintiff's responses to the motions for summary judgment direct the Court to specific statements in the [deficient affidavits and pleadings], as they must, Fed. R. Civ. P. 56(c)(3), the Court will undergo an independent analysis regarding the admissibility of those statements [rather than exclude the entirety of the documents]."), *aff'd*, 469 F. App'x 160 (4th Cir. 2012).

5

Perhaps anticipating this result, NC DPS asks the court, in the alternative, to exclude certain paragraphs of Plaintiff's Affidavit from the court's consideration; specifically, Paragraph Nos. 7, 8, 9 & 11. NC DPS contends that the statements within these paragraphs are not based on personal knowledge, but instead rely upon speculation, hearsay, or are simply conclusory in nature.[1] *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[Summary judgment affidavits cannot be conclusory . . . or based on hearsay.") (citations omitted). The court will examine each paragraph in turn.

### 1. Paragraph No. 7

In this paragraph, Plaintiff states: "In response to [the OAH's finding that NC DPS discriminated against her], the Defendants refused to take any action to remediate their actions. Left with no other options, I filed this lawsuit." The court does not discern how the information in this statement can be considered inadmissible. It will not be excluded.

### 2. Paragraph Nos. 8 & 9

Paragraph No. 8 states the following: "As noted in [the OAH's Notice], Sergeant Gardner had a previous history of inappropriate conduct toward female staff. Another Correctional Officer, CO Greene, reported Gardner for sexual harassment in 2007, the result of which was Gardner receiving a written warning. See [OAH Notice], page 10-11, Paragraph 43." Paragraph No. 9, in turn, states: "Despite Gardner receiving this Written Warning for what appears to be the same sort of actions he displayed to me, this written warning was not considered during the investigation of my claims. See [OAH Notice], page 11-12, Paragraph 46. I also gave them the names of witness

---

[1] NC DPS also challenges the statements in these paragraphs to the extent they are based on statements in the OAH's Notice of Investigative Findings, arguing that they are hearsay. As discussed below, the Notice is not hearsay under the Federal Rules of Evidence.

6

whom they did not contact."

While much of this information may not be within Plaintiff's personal knowledge, she is nevertheless largely referring to statements within the OAH Notice. For the reasons discussed below, the factual findings contained in the OAH Notice may be admissible at trial. The only portion of the above paragraphs the court cannot find admissible is Plaintiff's statement that "they" –presumably officials at NC DPS– did not contact certain witnesses. There is an insufficient basis in the Affidavit for this court to find that fact to be within Plaintiff's personal knowledge.[2]

**3. Paragraph No. 11**

Finally, NC DPS argues the court cannot consider Paragraph No. 11, which states: The Defendants claim that I did not report [Gardner's allegedly inappropriate conduct.] As my deposition testimony shows, along with the [OAH Notice], I reported these incidents repeatedly. Apparently the Defendants concluded, despite Sergeant Gardner's documented history of inappropriate actions with female subordinate staff, that he is telling the truth and I am not."

The first two sentences are within Plaintiff's personal knowledge, are not conclusory, and are not based on hearsay. The court cannot discern a reason to exclude those statements from its consideration of the Motion for Summary Judgment. The court, however, agrees that the third sentence is based on Plaintiff's speculation, and accordingly, it will not be excluded.

---

[2] Nevertheless, Plaintiff will still be able to proffer evidence about which, and how many, witnesses were contacted by NC DPS during the internal investigation, because of the factual findings made by the OAH. *See* OAH Notice [DE-30-4] ¶ 23 (stating that Plaintiff provided names of witnesses to NC DPS, and of these witnesses, only Captain Dublin was interviewed).

## B. OAH's Notice of Investigative Findings

NC DPS also argues that the court cannot consider Notice of Investigative Findings issued by the OAH, because it constitutes impermissible hearsay.

It is true that generally, "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted" is inadmissible as hearsay. Fed. R. Evid. 801(c). There are, of course, numerous exceptions to this rule. Pertinent to this case is the exception set forth in Federal Rule of Evidence 803(8), which excludes from the general hearsay rule:

[a] record or statement of a public office if:
(A) it sets out:
  (i) the office's activities;
  (ii) a matter observed while under a legal duty to report . . . ; or
  (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
(B) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8). Plaintiff contends that this exception applies to the OAH's Notice. The court agrees.

First, it is well settled that a district court may find determinations made by the Equal Employment Opportunity Commission ("EEOC") admissible under Rule 803(8) as long as the circumstances do not indicate a lack of trustworthiness. *See, e.g., Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) (observing that "[p]rior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo" and citing Rule 803(8)); *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1342 (3d Cir. 2002) (explaining that EEOC determinations, being government reports, are admissible under Rule 803(8) so long as no circumstances indicate a lack of trustworthiness); *Blasic v. Chugach Support Servs.*

8

*Inc.*, Civil No. WDQ-04-4022, 2010 WL 3294353 at *4 (D. Md. Aug. 20, 2010).[3] Second, it is undisputed that the OAH functions as the state agency tasked with reviewing discrimination charges filed by state or local government employees and referred to it by the EEOC. *See* N.C. Gen. Stat. §§ 7A-759, 126-16, 126-36; *see also Collins v. Franklin Cnty.*, 861 F. Supp. 2d 670, 674 (E.D.N.C. 2012) (noting that North Carolina "has designated the North Carolina Office of Administrative Hearings (OAH) as the deferral agency for discrimination claims"). There appears to be no reason to distinguish between a determination issued by the EEOC and one issued by the OAH. Because the Notice sets out, in part, factual findings from its investigation of Plaintiff's charge, and because NC DPS has not argued that the circumstances indicate a lack of trustworthiness, the court finds that the Notice is not hearsay, pursuant to Rule 803(8). Accordingly, the court will not exclude the Notice from its consideration of NC DPS's motion for summary judgment.

## III. MOTION FOR SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come

---

[3] Of course, even if a court finds that a report or determination is not hearsay under the exception set forth in Rule 803(8), the court may still determine that a report, or portions thereof, should not be admitted after evaluating the report's probative value and possible prejudicial effect. *See Cox v. Babcock & Wilcox Co.*, 471 F.2d 13, 15 (4th Cir. 1972); *Blasic*, 2010 WL 3294353 at *10.

forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. FACTS

The facts, stated in the light most favorable to Plaintiff, are as follows:

### A. Plaintiff's Employment at NC DPS

In 2005, Plaintiff began work as a Correctional Officer at the North Carolina Correctional Institution for Women ("NCCIW"). At all times relevant to conduct complained of in the Complaint, the Warden of NCCIW was Bianca Harris. On September 12, 2005, at the start of her employment, Plaintiff signed a Statement of Understanding acknowledging that she was responsible for reading and understanding her employer's Unlawful Workplace Harassment Policy. *See* Bianca Harris Aff. [DE-26-1], Ex. 1. That policy details what the NC DPS[4] considers to be inappropriate and/or illegal behavior, including sexual harassment. The policy also provided detailed information about how, and to whom, NC DPS employees should report discriminatory conduct. *See* Bianca Harris Aff. [DE-26-1], Ex. 2.

On or about May 18, 2009, Plaintiff was assigned to NCCIW's Operations Unit ("OPS"). Officers working on the OPS unit have an assigned shift work time, but they rotate to various positions within the NCCIW based on the facility's needs. In this position, Plaintiff reported to two sergeants, who in turn reported to lieutenants. The lieutenants reported to a captain, who in turn

---

[4] At the time, correctional institutions within the State of North Carolina were managed by the former state agency, the Department of Correction, which later was folded into the NC DPS. The court will refer to NC DPS throughout the memorandum.

10

reported to a assistant superintendent. *See* Bianca Harris Aff. [DE-26-1]; Ex. 3. One of the two sergeants to whom Plaintiff reported was William Gardner. *Id.* ¶ 7.

## B. December 5, 2009 Incident

As part of their duties, two of Plaintiff's superiors, Captain Edna Dublin and Lieutenant Sheila Eason, routinely walked the yard and flash the towers with a flashlight to see if the assigned correctional officer is alert. The correctional officer was expected to flash back to Captain Dublin and Lieutenant Eason to show that he or she is alert. *See* OAH Notice [DE-30-4] ¶ 8.

On December 5, 2009, Plaintiff was assigned to Tower 4 at NCCIW. Lieutenant Eason allegedly flashed Tower 4 numerous times and failed to get a response. Lieutenant Eason then went to another part of the facility and called the tower to speak to Plaintiff, informing her that she had flashed the tower approximately 15-16 times, and did not get a response. Lieutenant Eason informed Plaintiff that she needed a "statement" from her because Plaintiff had failed to flash in response. *See* OAH Notice [DE-30-4] ¶ 9. During the course of the conversation, Plaintiff apparently disputed that Lieutenant Eason had flashed Tower 4; instead, Plaintiff thought Eason had flashed Tower 1, to which she was not assigned. *See* Pl.'s Dep. [DE-26-2] pp.106-07.

Plaintiff signed an Employee/Witness Statement form indication that she was on the phone with Sergeant William Gardner going over her timesheet and looking over her calendar when Lieutenant Eason was supposed to have flashed her. Plaintiff said in her statement that she did not flash back in return because she did not see Lieutenant Eason. *See* OAH Notice [DE-30-4] ¶ 10.

Sergeant Gardner, however, in a signed statement and in conversation with Lieutenant Eason, denied he was on the phone with Plaintiff. Lieutenant Eason also reported, in a signed statement, that she had contacted Sergeant Gardner –because he was responsible for the correctional officer

11

assigned to the tower – to find out if the correctional officer had gone to the bathroom. Sergeant Gardner told Lieutenant Eason that Plaintiff was not in the bathroom, and was supposed to be alert. He also stated that if an officer needs to use the bathroom, they are supposed to call and report to the Gate Sergeant. Lieutenant Eason submitted her signed statement, along with the statements of Plaintiff and Sergeant Gardner, to Captain Dublin. *See* OAH Notice [DE-30-4] ¶ 10.

## C. Plaintiff's reports of sexual harassment

On December 9, 2009, Plaintiff met with Captain Dublin to discuss the allegation that she failed to return Lieutenant Eason's flash to the tower. During the course of their meeting, Captain Dublin asked Plaintiff why Sergeant Gardner would lie about Plaintiff. Plaintiff then told Captain Dublin that Sergeant Gardner had been sexually harassing her. *See* Pl.'s Dep. [DE-30-3] pp.109-110.

The record does not indicate what, exactly, Plaintiff told Captain Dublin about the sexual harassment. Plaintiff contends, however, that she then filled out a form alleging (10) specific incidents of unwelcome and unsolicited conduct of a sexual nature by Sergeant Gardner, beginning in May 2009 to January 2010[5] and gave it to Captain Dublin. Plaintiff contends that:

Sgt. Gardner would often make sexual remarks and advances towards her during times they were alone; Sgt. Gardner would ask her out on dates; ask for her phone number and tried to find out where she lived (he often made threats he could get this information); Sgt. Gardner told her that he could help her or hurt her. Plaintiff perceived his comments as a threat; he told her he missed a woman's touch and he wanted to make love to her; he told her that he really liked her, he was worried about her, he wished he could comfort her, he would be good to her, he would make love to her, and there would be no more lonely weekends; and Sgt. Gardner continually brushed up against and touched her.

---

[5] It is not apparent to the court how Plaintiff could have composed, on December 9, 2009, a statement detailing sexual harassment that occurred in January 2010. The parties do not discuss this discrepancy in their briefing.

12

Compl. [DE-30-2] ¶ 16; OAH Notice [DE-30-4] ¶ 11. Plaintiff asserts that she continuously denied Sergeant Gardner's advances and asked him to stop. *Id.* The record suggests that Plaintiff gave this statement, or some other one detailing sexual harassment, to Captain Dublin. *See* Pl's Dep. [DE-30-3] p. 110.

Plaintiff asserts that on the same day she told Captain Dublin about the sexual harassment, she also completed three additional "Employee Witness Statement Forms" and slid them under the door to the office of Assistant Superintendent for Custody and Operations Doris Sayles. Compl. [DE-30-2] ¶ 17; OAH Notice [DE-30-4] ¶ 12. According to Plaintiff, she detailed in the statements that she felt threatened and fearful of losing her job because Sergeant Gardner was her supervisor and he had lied in his statement on December 5, 2009, and she provided her own account of the events of December 5, 2009. Additionally, she requested a meeting with Assistant Superintendent Sayles regarding her sexual harassment allegations. Compl. [DE-30-2] ¶ 17; OAH Notice [DE-30-4] ¶ 12; Pl's Dep. [DE-26-2] pp. 115-16.

Plaintiff completed another Employee Witness Statement Form on December 10, 2009, asserting that Sergeant Gardner was lying in his December 6, 2009 written statement because Plaintiff would not go out with him or have sex with him. This statement included a list of co-workers Plaintiff had told about Sergeant Gardner's advances as well as co-workers who Sergeant Gardner had made comments to and/or asked out on dates. Compl. [DE-30-2] ¶18; OAH Notice [DE-30-4] ¶ 13; Pl's Dep. Ex. 36 [DE-30-3]. Plaintiff contends that she again slid this information under Assistant Superintendent Sayles' office door, but the record does not reflect when she did this. OAH Notice [DE-30-4] ¶ 13.

On December 19, 2009, Plaintiff completed yet another Employee Witness Statement Form,

13

again alleging sexual harassment by Sergeant Gardner. Compl. [DE-30-2] ¶ 19; OAH Notice [DE-30-4] ¶ 14. Plaintiff asserts she submitted this form to her employer, but the record does not reflect the specific individual or office to whom the form was directed. *Id.*

Five days later, on December 24, 2009, Plaintiff was informed by Captain Dublin that she would not receive disciplinary action for the December 5, 2009, flashing incident because Lieutenant Eason had made a mistake. Compl. [DE-30-2] ¶ 20; OAH Notice [DE-30-4] ¶ 15.

On January 1, 2010, Plaintiff completed another Employee Witness Form stating that Sergeant Gardner told her that if she was unhappy, she needed to quit her job. Plaintiff also stated that Sergeant Gardner then took his penis out of his pants and shook it at her. The record does not reflect whether Plaintiff submitted this form to anyone at NC DPS. Compl. [DE-30-2] ¶ 21; OAH Notice [DE-30-4] ¶16.

On February 3, 2010, Plaintiff submitted another Employee Witness Statement Form to Assistant Superintendent Sayles. The form was dated January 1, 2010, and stated:

on 01/01/10 after returning from refueling SGT Gardner told me to 25 the gatehouse, so he could start my new travel log. One [sic] I stopped @ the gatehouse, he took the travel log & told me if I was that unhappy I needed to quit my job. He then took his penis out of his pants & shook it @ me. I didn't tell anyone because I was ashamed and appalled, felt like I brought this on myself. I was just embarassed after speaking with my Dr. & attorney they suggested I report it.

*See* Bianca Harris Aff. [DE-26-1]; Ex. 6. Assistant Superintendent Sayles informed Warden Harris of the allegations made by Plaintiff in the statement on that same day, February 3, 2010. *See* Bianca Harris Aff. [DE-26-1] ¶ 13.[6]

---

[6] Both Sayles and Harris contend that this was the first notification they had received of Plaintiff's allegations of Sergeant Gardner's harassment.

14

At the time Sayles notified Warden Harris about the statement she received from Plaintiff on February 3, 2010, Sergeant Gardner already had been reassigned to another shift rotation and was no longer overseeing Plaintiff's work, nor was he working on a shift where he would be in contact with Plaintiff. Warden Harris requested that Assistant Superintendent Sayles and Captain Larry Marion conduct an internal investigation.

## D. NC DPS Investigation of Plaintiff's Allegations

As part of the investigation, Assistant Superintendent Sayles and Captain Marion met with Sergeant Gardner on February 16, 2010.[7] Sergeant Gardner wrote in a Employee Witness Statement Form that he and Plaintiff had gone out together on two occasions prior to his promotion to Sergeant, and although they kissed, they had did not have sexual relations. Sergeant Gardner denied sexually harassing or exposing himself to Plaintiff. OAH Notice [DE-30-4] ¶ 20. Plaintiff asserts, however, that the Office of State Personnel's Personnel Action form (PD-105) shows that Sergeant Gardner was promoted to Sergeant effective November 1, 2004 – prior to the commencement of Plaintiff's employment with NC DPS on September 5, 2005. OAH Notice [DE-30-4] ¶ 22. Sergeant Gardner also signed an Employee Witness Statement on March 9, 2010, denying that he exposed his penis to Plaintiff and denying that he made any sexual advances to her. *Id.*

Captain Marion and Assistant Superintendent Sayles also interviewed Plaintiff. Plaintiff contends that she provided them with the names of four witnesses who had information relative to her claim of sexual harassment. Compl. [DE-30-2] ¶ 28; OAH Notice [DE-30-4] ¶ 23. Plaintiff contends that Sayles and Marion only interviewed one of those witnesses, Captain Dublin. OAH

---

[7] The OAH Notice states that the investigation began on February 17, 2010, but also states that the interview of Sergeant Gardner, allegedly on February 16, 2010, was part of the investigation. Neither party addresses this discrepancy.

15

Notice [DE-30-4] ¶ 23. During her interview, Captain Dublin stated that Plaintiff had told her that Sergeant Gardner had asked her out one time, and that Plaintiff's allegation of sexual harassment came up after Plaintiff thought she was going to get a written warning. OAH Notice [DE-30-4] ¶ 28.

During this same time period, NC DPS placed Sergeant Gardner on Investigatory Status effective February 17, 2010. Gardner was instructed not to report to NCCIW, and not to discuss the investigation with anyone else. *See* Bianca Harris Aff. [DE-26-1] ¶ 18-19. After the "initial investigatory placement," Gardner was allowed to return to work at NCCIW. He was assigned, however, to work supervising a male construction crew on NCCIW grounds during a day shift. This shift assignment was opposite to that of Plaintiff, who continued to work nights in the OPS unit. *Id.* ¶ 20.

While the investigation was ongoing, Plaintiff filed a charge of discrimination with the EEOC alleging she was being discriminated against based on race and sex. The charge was transferred to OAH for investigation. OAH Notice ¶ 31.

As part of the internal NC DPS investigation, Sergeant Gardner was required to take a polygraph test on April 15, 2010. He was asked, "Did you show your penis to Ms. King?" and "Did you ever ask Ms. King for sexual favors?" Sergeant Gardner responded "no" to both questions. OAH Notice ¶ 33. The polygraph examiner concluded: "Upon careful analysis of the examinee's polygraph examination data, it is the interpretation of the examiner that there were NO SIGNIFICANT REACTIONS noted during this polygraph examination." *Id.*

Plaintiff also was required to take a polygraph examination, which was conducted on April 23, 2010. Plaintiff was asked, "While at the gatehouse, did Sgt. Gardner show you his penis?" and "While at work, did Sgt. Gardner every make inappropriate sexual comments to you?" Plaintiff

16

answered both questions with "yes." The polygraph examiner concluded: "Upon careful analysis of the examinee's polygraph examination data, it is the interpretation of this examiner that there SIGNIFICANT REACTIONS noted during this polygraph examination. Therefore deception was indicated." OAH Notice [DE-30-4] ¶ 34.

Soon after, Assistant Superintendent Sayles sent a memorandum to Warden Harris, detailing the internal investigation. *See* Bianca Harris Aff. [DE-26-1], Ex. 8. Notably, the memorandum did not include information about a written warning Sergeant Gardner received on October 16, 2007 for unacceptable personal conduct resulting from actions unbecoming an officer. Sergeant Gardner was issued the warning after a correctional officer, Janet Greene, told a lieutenant that she had been experiencing sexual harassment from Sergeant Gardner.[8] The lieutenant asked Greene to write a statement, which was then submitted to Assistant Superintendent Sayles. In response to Greene's allegations, Sergeant Gardner admitted that he and Greene had entered into a relationship that contained some level of physical intimacy, and that he also had lent Greene money. Because this admission indicated that Sergeant Gardner did not maintain a professional working relationship with Greene nor had he remained with the boundaries of his role as a sergeant, he was issued the written warning. OAH Notice [DE-30-4] ¶ 43. This warning was signed by Assistant Superintendent Sayles. *Id.*

Sayles allegedly did not consider this October 16, 2007 written warning during the course of the investigation because she did not want to hold his prior actions against him if he had already taken corrective action. OAH Notice [DE-30-4] ¶ 46. Sayles also apparently did not consider the

---

[8] Greene reported her allegations after she herself received a written warning for calling Sergeant Gardner an "ass" over the radio.

written warning to be "active;" however, the record indicates that Sergeant Gardner had received a second written warning on March 6, 2009 for unsatisfactory job performance, which explicitly stated that the October 16, 2007 written warning would remain active until September 2010. *Id.* ¶¶ 45-46.

The memorandum also stated that Captain Dublin reported that Plaintiff never reported any incidents to her regarding Sergeant Gardner. Finally, Assistant Superintendent Sayles opined that despite Plaintiff's reports to the contrary, it did not appear that Plaintiff's assignments to various posts through NCCIW was in retaliation for her reporting of sexual harassment. Rather, Assistant Superintendent Sayles stated Plaintiff's assignment to various posts was a function of being assigned to the OPS unit, which supports various posts. *See* Bianca Harris Aff. [DE-26-1], Ex. 8.

After reviewing the internal investigation, Warden Harris determined that Plaintiff's allegations against Gardner could not be substantiated. *Id.* ¶ 22. On May 20, 2010, Captain Dublin sent a letter to Plaintiff and Sergeant Gardner informing them of the following: "This office agrees with the findings that there was insufficient evidence to substantiate the allegations of inappropriate conduct in the workplace. Therefore this office will take no further action and considers the matter closed." OAH Notice [DE-30-4] ¶ 37.

## E. Plaintiff's separation from employment

During the spring of 2010, Plaintiff took multiple medical leaves from employment. Specifically, she submitted documentation to NC DPS from medical providers to excuse her absences from work for the following time periods: February 26, 2010 to March 8, 2010; from March 11 to March 26, 2010; from March 15, 2010 until April 24, 2010, and May 28, 2010. *See* Bianca Harris. Aff. [DE-26-1] ¶ 23.

On June 8, 2010, Plaintiff was scheduled to complete her correctional officer re-certification

18

process which was necessary for her to maintain her professional certification as a correctional officer from the Criminal Justice Education and Training Standards Commission. *Id.* ¶ 25. In fact, her certification from the Commission was to expire on June 8, 2010. *Id.* ¶ 26. Without the proper certification from the Commission, Plaintiff would not be able to perform her duties as a correctional officer. *Id.* ¶ 27.

On June 4, 2010, Plaintiff submitted documentation to NCCIW from her physician which indicated that Plaintiff was currently undergoing treatment with medication that would cause heat intolerance, and instructed that Plaintiff should not be assigned to duty in areas with high heat temperatures. *Id.* ¶ 28. NCCIW's Administrative Services Manager, Yolanda Sinclair, met with and informed Plaintiff that she would not be able to work given her inability to complete her recertification. Sinclair provided Plaintiff with an "Essential Job Functions" form to be completed by her medical providers. Sinclair also provided Plaintiff with forms to request to be placed on short term disability and to be place on unpaid medical leave. Plaintiff completed the forms.

On June 7, 2010, Plaintiff's physician submitted documentation indicating that Plaintiff was not disabled from a urological standpoint, but did have restrictions from working in heat due to medication she was taking. The doctor referred NC DPS to Plaintiff's psychiatrist for disability questions. On June 15, 2010, Plaintiff submitted documentation from her psychiatrist, which stated that Plaintiff was unable to perform work of any kind. *See* Bianca Harris. Aff. [DE-26-1], Ex. 13.

On June 17, 2010, Plaintiff submitted her official notice of resignation to NCCIW. *See* Bianca Harris, Aff. [DE-26-1], Ex. 14. The notice indicated that Plaintiff was dissatisfied with her work conditions, and she was resigning for health reasons. *Id.* Plaintiff testified in her deposition that she chose to resign, rather than apply for short term disability benefits, because the short-term

19

disability benefits did not provide her with enough money. Pl.'s Dep. [DE-26-2] p. 180.

## V. ANALYSIS

The parties' briefing suggests that Plaintiff is proceeding on three theories of liability: (1) a hostile work environment in violation of Title VII; (2) constructive discharge in violation of Title VII; and (3) retaliation in violation of Title VII. The court will examine each theory in turn.

### A. Hostile Work Environment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] . . . terms, conditions or benefits of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII is violated "[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). To establish a claim for a hostile work environment on the basis of sex in violation of Title VII, a plaintiff must prove "that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (internal quotation marks omitted).

Here, NC DPS does not, at least for purposes of its motion for summary judgment, challenge whether Plaintiff has proffered sufficient evidence on the first three elements.[9] Instead, NC DPS focuses on the fourth element: whether Sergeant Gardner's alleged conduct is imputable to NC DPS.

---

[9] The court observes that Plaintiff has proffered sufficient evidence to show that Sergeant Gardner's alleged conduct to her was (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.

20

"Whether and under what standard an employer may be held liable for sexual harassment depends on whether the harasser was a supervisor or merely a co-worker and on whether the plaintiff suffered a tangible employment action." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 243 (4th Cir. 2010), *abrogated on other grounds by Vance v. Ball State Univ.*, — U.S. — , 133 S.Ct. 2434 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance*, 133 S. Ct. 2439. If, on the other hand, the harassing employee is the victim's supervisor, "different rules apply." Namely,

[if] the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonable failed to take advantage of the preventative or corrective opportunities that the employer provided.

*Id.* Accordingly, "it matters whether a harasser is a 'supervisor' or simply a co-worker," and this court will address that issue first. *Id.*

NC DPS argues that in light of the Supreme Court's recent decision in *Vance*, Sergeant Gardner cannot be considered Plaintiff's supervisor for purposes of Title VII. In *Vance*, the Supreme Court held that in the context of a Title VII hostile work environment claim, an employee is a "supervisor" "only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2434 (internal quotation omitted). The facts in *Vance* concerned hostile work environment claims brought by a catering assistant, Vance, who alleged she was repeatedly racially harassed by Davis, a catering specialist. Although the parties "vigorously dispute[d] the nature and scope of Davis' duties," they agreed that Davis "did not have the power

21

to hire, fire, demote, promote, transfer, or discipline Vance." *Id.* at 2439. Accordingly, despite "Davis' job description, which gave her leadership responsibilities, and . . . evidence that that Davis at times lead or directed Vance and other employees in the kitchen," *id.* at 2449, the Supreme Court held that Davis was not a supervisor for the purposes of Title VII as a matter of law, "[b]ecause there [was] no evidence that [the employer] empowered Davis to take any tangible employment actions against Vance." *Id.* at 2454.

Applying the standard set forth in *Vance* to the facts of this case, the court concludes, as a matter of law, that Sergeant Gardner was not Plaintiff's supervisor for purposes of a Title VII harassment claim. The evidence Plaintiff proffers in support of her contention that Sergeant Gardner was her supervisor, within the meaning of Title VII, is: (1) Warden Harris' affidavit stating that Plaintiff was under the "partial supervision" of Gardner when she was working on the OPS unit; (2) an organization chart, attached to Harris' affidavit, apparently showing that correctional officers reported to sergeants, and (3) NC DPS's sexual harassment policy, which provides a "warning" to "supervisory level employees." *See* Bianca Harris Aff. [DE-26-1] ¶7; *Id.,* Ex. 3 ("Shift Organization Chart"); *Id.*, Ex. 2 ("Unlawful Workplace Harassment and Professional Conduct Policy"); *see also* Pl.'s Resp. to Def.'s Mot. for Summ. J. [DE-30], pp. 2, 6, 13-16. None of this evidence shows that Sergeant Gardner was empowered by NC DPS to take tangible employment actions against Plaintiff.

With regard to Harris' statement that Plaintiff was under the "partial supervision" of Sergeant Gardner while she was working on the OPS unit, the *Vance* decision made clear that an employer's colloquial use of the term is not controlling for purposes of Title VII. *See Vance*, 133 S. Ct. at 2444-46 (observing that "the term 'supervisor' has varying meanings both in colloquial usage and in the law" and for that reason a court cannot rely on the term's general usage for determining who is a

22

supervisor under Title VII); *see also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008) (observing that while a co-employee may have been the plaintiff's "'supervisor' in the colloquial sense of the word, [he] did not possessor the authority that would make him a supervisor for purposes of Title VII").[10] Nowhere in Harris' affidavit does she state that as part of being Plaintiff's supervisor, Sergeant Gardner had the authority to hire, fire, promote or reassign Plaintiff. Indeed, Warden Harris instead states that while "Gardner would be responsible for supervising Plaintiff's day-to-day activities when she was assigned to a post falling under his supervision," he "did not have broader management responsibilities with regards to Plaintiff's supervision such as making her post assignments, shift assignments, issuing written warnings or other adverse employment action to Plaintiff." Aff. of Bianca Harris [DE-26-1] ¶ 8.

Nor does the organization chart, showing that correctional officers report to sergeants, show that Sergeant Gardner possessed the authority to take tangible employment action against Plaintiff. At most it suggests, consistent with Warden Harris' statements in her affidavit, that he was responsible for supervising Plaintiff's daily activities. This, alone, is not enough to qualify as a supervisor under Title VII. *See Vance*, 133 S. Ct. at 2448 ("The ability to direct another employee's tasks is simply not sufficient."); *see also Andoissamy*, 547 F.3d at 848 ("A 'supervisor' for purposes of Title VII is not simply a person who possesses authority to over the plaintiff's job performance . . . .").

Finally, the "warning" in the "Unlawful Workplace Harassment and Professional Conduct

---

[10] The court recognizes that an opinion issued by the Seventh Circuit Court of Appeals is not controlling within this circuit. Nevertheless, because the Supreme Court in *Vance* expressly adopted the definition of "supervisor" used by the Seventh Circuit, this court finds the opinions of the Seventh Circuit to be instructive.

Policy" also does not show that Sergeant Gardner was empowered to take tangible employment action against Plaintiff. The warning states, in pertinent part, the following:

Supervisors and the Department are held to a higher liability standard for conduct constituting illegal harassment or discrimination of subordinate level personnel. Any individual who is or reasonably appears to be in a position of workplace authority or control over another may be held to be a supervisor for purposes of determining liability for harassment or discrimination, (e.g. correctional sergeants over correctional officers).

*See* Bianca Harris Aff. [DE-26-1], Ex. 2 § O ("Unlawful Workplace Harassment and Professional Conduct Policy"). This warning does nothing more than accurately summarize the law in this circuit pre-*Vance* as to who could be considered a supervisor under Title VII. *See Whitten*, 601 F.3d at 245-46 (rejecting the view that supervisory status is determined solely by the ability to take tangible employment action, and explaining that "other features of the employment relations" are also relevant to whether an employee is a supervisor), *abrogated by Vance*, 133 S. Ct. at 2443. The warning therefore does not constitute evidence as to what tangible employment actions, if any, Sergeant Gardner was empowered to take against Plaintiff.

The court also observes that Plaintiff argues that "'[a]n individual whose job responsibilities include the authority to recommend tangible job decisions affecting an employee qualifies as his or her supervisor even if the individual does not have the final say. . . . As long as the individual's recommendation is given substantial weight by the final decision maker(s), the individual meets the definition of supervisor.'" Pl.'s Resp. to Def.'s Mot. for Summ. J. [DE-30], p. 15 (quoting *Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, EEOC* (1999)). The Supreme Court appears to have recognized the validity of this assertion in *Vance*, observing that "[i]f an employee does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion

24

when making decisions and will likely rely on other workers who actually interact with the affected employee" and therefore "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." 133 S.Ct. at 2452. This assertion, however, does little to help Plaintiff because she has not pointed to any evidence showing that Sergeant Gardner made any recommendations concerning tangible employment actions, let alone that the decision-makers accorded his recommendations substantial weight.

In short, Plaintiff has not proffered or cited to any evidence showing that Sergeant Gardner was empowered to take tangible employment action against her. Accordingly, under *Vance*, the court must conclude, as a matter of law, that Sergeant Gardner was not Plaintiff's supervisor within the meaning of Title VII.

This determination, however, is not fatal to Plaintiff's Title VII sexual harassment claim. "Where an employee has been harassed by a coworker, 'the employer may be liable in negligence [under the fourth element] if it knew or should have known about the harassment and failed to take effective action to stop it.'" *EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003)). The Fourth Circuit has explained:

> Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment. . . .
>
> The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination. . . . However, the mere promulgation of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith.

25

*Id.* (quotations and citations omitted; alteration in original). Where an employer does have an adequate policy that provides reasonable procedures for victims to register complaints, the pertinent inquiry for a court on summary judgment is whether there is sufficient evidence to demonstrate that the employer's response to the complaints under its policies was "not reasonably calculated to end the harassment, and therefore, that liability for the harassment may be imputed to [the employer]."

*Id.*

Although there is "no exhaustive list or particular combination of remedial measures or steps that an employer need employ to insulate itself from liability," courts have considered factors such as "the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the employer's response was actually effective." *Id.* (quotation and citations omitted). Importantly, however, "[t]he cessation of 'harassment shows effectiveness, which in turn evidences such reasonable calculation.'" *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1988)); *see also Spicer v. Commonwealth of Va., Dep't of Corr.* 66 F.3d 705, 711 (4th Cir. 1995) (en banc) ("[W]hen an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well.").

Here, the evidence, taken in the light most favorable to Plaintiff,[11] shows that at the minimum, she informed Captain Dublin on December 9, 2009, that she was being sexually harassed by Sergeant Gardner. *See* Pl.'s Dep. [DE-30-3] p. 109-10. Plaintiff also asserts that during December 2009, she submitted at least one written complaint about Sergeant Gardner's alleged

---

[11] The court recognizes that NC DPS disputes Plaintiff's version of the facts, and specifically maintains that it did not receive notice of Plaintiff's allegations until February 2010. At this juncture, however, the court is obligated to view the facts in the light most favorable to Plaintiff.

26

sexual harassment to Assistant Superintendent Sayles. *See* Pl.'s Dep. [DE-26-2] pp. 115-16. Despite alerting at least two of her superiors in December 2009 to Sergeant Gardner's alleged sexual harassment, no action was taken by NC DPS until February 2010. If, at the bench trial in this matter, the court finds Plaintiff's testimony as to these reports to be credible, then there will be sufficient evidence for the court to find that NC DPS was on notice of the possibility of sexual harassment in December 2009, and nothing else appearing, its failure to take any action to investigate the allegations until February 2010 constitutes negligence. *See Howard v. Winter*, 446 F.3d 559, 570-71 (4th Cir. 2006) (finding that a reasonable juror could find the employer negligent where the plaintiff reported to a human resources officer that a co-worker had "put his hands on" her, and the human resources officer did not investigate the allegations).[12] Accordingly, NC DPS's motion for summary judgment on Plaintiff's Title VII hostile work environment claim is DENIED.[13]

---

[12] The parties also appear to dispute whether the actual investigation into the sexual harassment claims, which Plaintiff characterizes as inadequate, constitutes evidence of negligence. Given that NC DPS, after acknowledging Plaintiff's allegations in February 2010, assigned Sergeant Gardner to work an entirely different shift from Plaintiff, and that Plaintiff did not experience any additional sexual harassment after her allegations were acknowledged in February 2010, the court does not consider the nature of the investigation to be evidence of negligence. *See Spicer,* 66 F.3d at 711 ("[W]hen an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well.")*; see also Winter*, 446 F.3d at

[13] The parties' briefing indicates that another correction officer, David Frazier, told another sergeant about Plaintiff's allegations of harassment at some unidentified point in 2009. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. [DE-30], p. 8; *see also* OAH Notice [DE-30-4] ¶ 41 (stating that David Frazier was concerned about Plaintiff's allegations so he reported Plaintiff's claims to Sergeant Lakisha Knox). The parties have not addressed, head-on, whether Frazier's report to this sergeant is sufficient to put NC DPS on notice that Sergeant Gardner potentially was sexually harassing Plaintiff, in the context of this co-worker sexual harassment claim. *See, e.g., Zimmerman v. Cook Cnty. Sheriff's Dep't.*, 96 F.3d 1017, 1019 (7th Cir. 1996) ("The sheer pervasiveness of the harassment might support an inference that the employer must have known of it . . . *as might a complaint from someone other than the victim*.") (emphasis added, citations omitted); *see also* Bianca Harris Aff. [DE-26-1], Ex. 2 § I (providing that "[a]ny supervisor who becomes aware of allegations that reasonably may constitute a violation of the unlawful workplace harassment policy must report the allegations to the EEO Office immediately by phone (to be followed by a written report)").

27

**B. Constructive Discharge**

Plaintiff also asserts that she was constructively discharged. Specifically, she argues that Sergeant Gardner's actions toward her, combined with what she characterizes as an ineffective investigation of her allegations, forced her to resign.

"In this circuit, an employee is constructively discharged 'if an employer deliberately makes the working conditions of the employee intolerable in an effort to induce the employee to quit.'" *Whitten*, 601 F.3d at 248 (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir. 1995)). "A constructive-discharge plaintiff must therefore allege and prove two elements: (1) deliberateness of the employer's actions and (2) intolerability of the working conditions." *Id.* (internal quotations and citations omitted). "To prove deliberateness, the plaintiff must 'prove that the actions complained of were intended by the employer as an effort to force the employee to quit." *Id.* With regard to intolerability, it "is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign." *Blistein v. St. John's College*, 74 F.3d 1459, 1468 (4th Cir. 1996), *overruled on other grounds by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1988). "Rather '[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,' . . . that is, whether he would have had *no* choice but to resign." *Id.* (emphasis in original) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)).

Although courts have concluded that sexual harassment may rise to such intolerable levels that resignation may be an appropriate response, *see Pennsylvania State Police v. Suders*, 542 U.S.

28

129, 147-48 (2004),[14] Plaintiff has not presented sufficient evidence to support such a theory here. The record indicates that Plaintiff was not subjected to sexual harassment by Sergeant Gardner after January 2010. Given that his offending conduct had ceased, for several months, at the time of her resignation, Plaintiff cannot rely on it as a basis for intolerable working conditions. *See Munday v. Waste Mgmt. of N. America, Inc.*, 126 F.3d 239, 244 (4th Cir. 1997) (finding a constructive discharge claim insufficient where the plaintiff resigned her employment seventeen months after the last act of sex discrimination and harassment occurred).

Moreover, even if NC DPS had conducted an ineffective investigation of Plaintiff's allegations, this too is insufficient to support a constructive discharge claim under the circumstances of this case. In cases where an employer's inadequate response to sexual harassment allegations has been found to be a sufficient basis to support a constructive discharge claim, the employer had dismissed allegations out of hand, or continued to assign the employee to work with, or near, the alleged harasser. *See Whitten*, 601 F.3d at 248-49 (finding that although it was "a close question," the plaintiff had presented sufficient evidence as to constructive discharge where her manager dismissed out-of-hand her complaints about a co-worker's sexual harassment, including physical

---

[14] Generally, a plaintiff must show "something more" than general sexual harassment to show that conditions were so intolerable that a reasonable person would have felt compelled to have resign. *See Suders*, 542 U.S. at 146-47 ("For an atmosphere of sexual harassment or hostility to be actionable . . . the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . . A hostile-work environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.") (internal quotations and citations omitted); *see also Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 783-84 (D. Md. 2010) ("The 'severe and pervasive' standard required to state a hostile work environment claim is lower than the 'intolerability' standard required for a constructive discharge claim, and thus a finding that [the plaintiff's] hostile work environment claim is actionable does not necessitate a finding that he was constructively discharged.") (citing *Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir.2000) ;*Spencer v. Wal–Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir.2006); *Griffin v. Delchamps, Inc.*, 176 F.3d 480 (5th Cir.1999)).

assaults, and told the plaintiff to report to work as usual); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1133-34 (4th Cir. 1995) (finding that a plaintiff had proffered sufficient evidence to support constructive discharge claim where the cursory investigation failed to end the harassment and plaintiff continued to be supervised by alleged harasser who subjected him to daily epithets based on his national origin). Here, however, the alleged harassment stopped once NC DPS began its investigation and Sergeant Gardner was assigned to work a completely different shift from Plaintiff and had no contact with her. Even if the court could find at the bench trial that NC DPS did engage in an inadequate investigation, there are insufficient facts from which to find that Plaintiff's resignation was a reasonably foreseeable consequence of NC DPS's response. Accordingly, to the extent that Plaintiff has asserted a constructive discharge claim, NC DPS's motion for summary judgment is ALLOWED.

## C. Retaliation

The parties' briefing and the Amended Complaint in this matter refer, albeit obliquely, to retaliation. To the extent that Plaintiff asserts a retaliation claim against NC DPS, it too is subject to summary judgment.

Under Title VII "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The elements of a *prima facie* claim for retaliation under Title VII are (1) engagement in a protected activity; (2) an employer's adverse action against the plaintiff; and (3) a causal link between the protected activity and the adverse action. *Holland v. Washington Homes*,

30

*Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).

Here, there is no dispute that Plaintiff engaged in protected activity by reporting the alleged harassment by Sergeant Gardner. With regard to the second element, however, the only "adverse action" Plaintiff references in her response to the motion for summary judgment is the NC DPS's alleged failure to conduct an effective and complete investigation of her allegations of sexual harassment, and relies on the Sixth Circuit Court of Appeals' decision in *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008) for support. The court finds Plaintiff's reliance on *Hawkins* to be misplaced. In that case, the Sixth Circuit considered when an employer can be held liable for retaliatory actions of a plaintiff's coworker. The Sixth Circuit held that an employer will be liable for coworker retaliation if:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Id.* at 347. In this case, Plaintiff has proffered no evidence showing that she complained of retaliation by Sergeant Gardner or any other co-workers, nor has she shown that NC DPS failed to adequately respond to the allegations of retaliation.[15] Accordingly, *Hawkins* is not applicable to the facts in this case. Nor can the court find that, under the circumstances of this case, NC DPS'

---

[15] Although Plaintiff does not explicitly mention this, the record reflects that Plaintiff did complain to NC DPS about retaliation in the form of being denied the opportunity to work overtime and being assigned to various posts through the facility. *See* Aff. of Bianca Harris [DE-26-1], Ex. 8 (April 25, 2010, Internal Investigation Memorandum); Ex. 16 pp. 2-3 (Position Statements). She does not appear to take issue with the investigation into complaints of retaliation; only the investigation into the allegations of sexual harassment.

31

investigation–even if were found to be inadequate–constitutes retaliation. Accordingly, any claim of retaliation by Plaintiff is subject to summary judgment.

## VI. MOTION FOR TRIAL IN SECOND WEEK OF TERM

While the court was drafting the instant order, NC DPS filed a motion, with Plaintiff's consent, to continue the trial and pretrial conference in this matter. The court allowed the motion, and continued the trial until the term of court commencing on March 31, 2014. *See* January 6, 2014 Order [DE-39]. Plaintiff promptly filed a Motion For Trial in Second Week of Term [DE-40], wherein Plaintiff's counsel explains an outstanding familial commitment he has during the week of March 31st, and asks that the court set the trial for the second week of the term of court, rather than the first week.

Criminal cases require adherence to statutory as well as Constitutional speedy trial requirements, and for that reason criminal trials always preempt civil trials. Accordingly, it is unlikely–but not impossible–that the court will reach this matter during the first week of the March 31st term of court. As a corollary, however, the court notes that it cannot predict with any certainty how many criminal trials will be on that particular term of court. Additionally, there is at least one other civil trial–a jury trial–scheduled for the term.

With all that being said, Plaintiff's consent motion [DE-40] is ALLOWED, and the bench trial in this matter will not commence before April 14, 2014. The parties are cautioned that this ruling does not mean that the court is peremptorily setting this bench trial. All criminal matters and the civil jury trial will be reached first, and it is possible that the court will not reach this bench trial until a date after April 14, 2014.

32

## VI. CONCLUSION

For the foregoing reasons, Defendant NC DPS's Motion to Strike [DE-32] is DENIED

and the Motion for Summary Judgment [DE-25] is ALLOWED in part and DENIED in part.

Plaintiff's Motion For Trial in Second Week of Term [DE-40] also is ALLOWED, and the bench

trial in this matter will not commence before April 14, 2014.

SO ORDERED.

This the _9_ day of January, 2014.

James C. Fox
Senior United States District Judge